UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Erik Tweeton,                                                                         Civil No. 06-1130 (PAM/JSM)

          Plaintiff,

v.                                                                                        **MEMORANDUM AND ORDER**

Cheri L. Frandrup, et al.,

          Defendants.

---

This matter is before the Court on Defendants' Motions to Dismiss or for Summary Judgment. For the reasons that follow, the Court grants the Motions.

**BACKGROUND**

**A.    The Parties**

Plaintiff Erik Tweeton brought this 42 U.S.C. § 1983 action against Defendants Sergeant Paul J. Gorski, Captain Cheri L. Frandrup, Major Kent N. O'Grady, and an unnamed Jane Doe—all of whom are law enforcement officers with the Minnesota State Patrol—as well as Assistant Attorneys General Jerome Getz and Jeff Bilcik.

Tweeton has a strong aversion to motorists who follow his vehicle too closely or who swerve in the vicinity of his vehicle. Tweeton previously visited Officer James Gummert of the Apple Valley Police Department to complain about such conduct. In response, Officer Gummert gave Tweeton his business card, which contained a police badge logo and his contact information. Tweeton later laminated the card and carried it with him in his car.

To monitor driving behavior, Tweeton carried a video camera in his car and mounted

a fastener to attach the camera to his dashboard. Tweeton used the video camera to film other motorists as he drove and to protect himself against individuals who falsely accused him of crimes. In addition, Tweeton wired a flash device from a camera to a battery in his car and fastened the flash on top of a car seat. Tweeton directed the device, which flashed every five seconds, at other motorists.

**B.     The Traffic Stop on May 20, 2004**

On May 20, 2004, Sergeant Gorski drove his unmarked squad car southbound in the left lane of Pilot Knob Road in Eagan, Minnesota. As he was driving, he approached a vehicle driven by Tweeton, which was traveling at a slower speed in the same lane. As Sergeant Gorski approached, Tweeton applied his brakes. When Tweeton turned onto Diamond Path Road, Sergeant Gorski followed. Thereafter, Tweeton applied his brakes at least two more times. As Tweeton drove, he mounted the flash device on his seat and flashed it at Sergeant Gorski. Tweeton also turned on his video camera and mounted it on his dashboard facing Sergeant Gorski's vehicle.

Sergeant Gorski observed the flashing light and video camera. When Tweeton stopped at a stop sign, Sergeant Gorski pulled up beside Tweeton to observe. Tweeton then displayed Officer Gummert's laminated card. Based on Tweeton's conduct, including his use of brakes, his mounting and operation of the light and video camera, his flashing of the light, and his display of the badge logo, Sergeant Gorski concluded that Tweeton was impersonating a police officer and decided to cite Tweeton. Accordingly, he turned on his flashing red lights and pulled over Tweeton. After Sergeant Gorski asked Tweeton if he had

displayed an authentic police badge, Tweeton handed the officer the laminated business card, as well as his Minnesota driver's license. Tweeton then got out of his car.

Concerned that Tweeton might be armed, Sergeant Gorski directed Tweeton to the sidewalk or ground area and patted him down. Sergeant Gorski found no weapons. Tweeton tried to explain his actions and accused Sergeant Gorski of violating traffic laws "such as following too closely, careless driving, and speeding." (Compl. at 7.) Thereafter, Tweeton and Sergeant Gorski talked for "about nine minutes." (Id.) Sergeant Gorski then ordered Tweeton to sit on the shoulder of the road while Sergeant Gorski conducted a records check.

After Sergeant Gorski checked Tweeton's license and car registration, he returned to Tweeton's vehicle and told Tweeton that he needed the flash device, which was lying on the seat in plain view. Tweeton handed the device to Sergeant Gorski. Sergeant Gorski cited Tweeton for reckless driving, impersonating an officer, and operating a prohibited flashing light. Because Sergeant Gorski did not have a ticket book in his squad car, he informed Tweeton that he would mail the summons and complaint to Tweeton. The entire traffic stop lasted approximately ten minutes.

Sergeant Gorski mailed the summons and complaint to Tweeton at the address stated on Tweeton's driver's license. Sergeant Gorski subsequently learned that Tweeton had moved to Colorado, and the address on Tweeton's license was his parents' residence.

**C.     The Trial**

Tweeton elected to proceed to trial on the charges against him. Trial occurred in Dakota County District Court on November 2, 2004. Sergeant Gorski turned over the light

and laminated card to the prosecutor, who introduced them into evidence. Both Tweeton and Sergeant Gorski testified. Tweeton was convicted of reckless driving but acquitted of impersonating an officer and operating a prohibited flashing light.

**D.     The Letters to Sergeant Gorski and His Neighbors**

In December 2004, Tweeton mailed a letter to Sergeant Gorski's home residence. In the letter, Tweeton accused Sergeant Gorski of committing various crimes and demanded that Sergeant Gorski pay him money. According to Tweeton, if Sergeant Gorski complied with the demand, Tweeton would forgo efforts to punish Sergeant Gorski.[1] The letter recites personal information about Sergeant Gorski and his family that Tweeton had discovered, including their home address (which was unlisted), the license number of Sergeant Gorski's personal vehicle, the name of Sergeant Gorski's wife and the color and license number of her car, the names of four relatives and the fact that they resided in Florida, and the assessed value of the Gorski residence. Neither Sergeant Gorski nor any of his family members had provided Tweeton with this information. Finally, the letter threatened that Tweeton would notify Sergeant Gorksi's neighbors "about how dangerous and arrogant you are because you

---

[1] The punishments included: (1) prosecuting Sergeant Gorski for theft of the flash device; (2) causing Sergeant Gorski to miss work; (3) having the police commissioner question Sergeant Gorski; (4) serving a subpoena at Sergeant Gorski's home; (5) sitting Sergeant Gorski down and telling him how to do his job; (6) protesting in newspaper, television, and radio advertisements; (7) contacting four of Sergeant Gorski's relatives, whom Tweeton identified by first name and state of residence; (8) honking his horn outside Sergeant Gorski's house; (9) warning children about Sergeant Gorski on Halloween; (10) observing Sergeant Gorski on a daily basis; (11) obtaining a judgment against Sergeant Gorski; and (12) placing liens on Sergeant Gorski's property or bank account, thereby damaging his credit report.

sent lies to my relatives alleging crimes." (Frandrup Aff. App. A at 3.)

Tweeton also sent letters to sixty-seven of Sergeant Gorski's neighbors. At least one of the letters identified Sergeant Gorski as a "crooked" state trooper, asserted that Sergeant Gorski should be criminally prosecuted for various alleged offenses, and stated that Sergeant Gorski was being sued for theft, negligence, harassment, and defamation. It also suggested that the recipient e-mail Sergeant Gorski or contact the public safety commissioner if the recipient agreed that Sergeant Gorski should be fired.

**E.    Captain Frandrup**

After receiving the letter, Sergeant Gorski feared for the safety of his family and felt threatened and intimidated. He showed the letter to his superior, Captain Frandrup, and explained that he and his family were very upset about the letter. Captain Frandrup believed that the letter indicated Tweeton's intent to harm Sergeant Gorski and constituted stalking.

On December 30, 2004, Captain Frandrup wrote Tweeton a letter requesting him to discontinue correspondence with Sergeant Gorski. Captain Frandrup's letter stated that the documents sent to Sergeant Gorski were of a "harassing nature with intent to intimidate." (Id. App. E at 1.) She warned Tweeton that if he initiated contact with Sergeant Gorski or his family, the Minnesota State Patrol would seek a temporary restraining order against him and pursue criminal charges. The letter also recommended that Tweeton keep his "actions within the justice system." (Id.) Assistant Attorney General Bilcik reviewed and approved the letter before Captain Frandrup mailed it. Because she was unsure whether Tweeton lived in Minnesota or Colorado, Captain Frandrup mailed copies of the letter to the last known

5

addresses in both states. She also provided copies of the letter to Assistant Attorney General Bilcik and Major O'Grady.

Thereafter, Sergeant Gorski informed Captain Frandrup that Tweeton was carrying out the threats in his previous letter, and he showed her the letter addressed to Sergeant Gorski's neighbor. On January 13, 2005, Captain Frandrup asked Officer Jane Doe, an unnamed member of the state patrol, to accompany her, and the two went to the residence listed on Tweeton's driver's license to speak with him directly about the harassment. When they arrived, a man who identified himself as Tweeton's father answered the door. Captain Frandrup informed him that they wished to speak with Tweeton. He responded that Tweeton was in Colorado. She informed the father of the letters that Tweeton sent to Sergeant Gorski's neighbors and explained that the letters were harassing and defamatory. She asked him to help persuade Tweeton to stop his harassment and advised him that any complaints should be addressed to the Minnesota Department of Public Safety Internal Affairs Division. Finally, she informed the father that criminal charges could be filed against Tweeton if he persisted with his harassment.

In January 2005, Tweeton filed a formal complaint against Captain Frandrup and Sergeant Gorski with the Internal Affairs Division. After completing an investigation, Captain Kent Matthews concluded that there was no cause for any complaint against either officer.

**F.     State Court Action**

Tweeton brought a state court action against Captain Frandrup, Major O'Grady, and Commissioner of Public Safety Michael Campion in Ramsey County District Court. The state court complaint stated two claims. First, Tweeton brought a claim pursuant to 42 U.S.C. § 1983, alleging that Captain Frandrup and Major O'Grady violated his First and Fourteenth Amendment rights when Captain Frandrup sent the letter to Tweeton on December 30, 2004, and when O'Grady said he concurred with the letter's message. Second, Tweeton claimed that the Commissioner of Public Safety defamed Tweeton when the Commissioner failed to condemn Captain Frandrup and the other officer for informing Tweeton's parents that Tweeton sent sixty-seven letters to Sergeant Gorski's neighbors.

On January 31, 2006, Assistant Attorney General Getz moved to dismiss the state action against the Commissioner for insufficiency of service of process. On March 24, 2006, Assistant Attorney General Getz filed a motion to dismiss or for summary judgment, challenging the claims and the sufficiency of process. Tweeton was frustrated and confused by these procedures. On May 8, 2006, the Ramsey County District Court dismissed both of Tweeton's claims.

## DISCUSSION

In this action, Tweeton seeks relief under 42 U.S.C. § 1983, alleging violations of various constitutional rights.

**A.     Standard of Review**

Defendants filed Motions to Dismiss or for Summary Judgment. Because the parties

submitted materials outside of the pleadings, the Court will determine whether summary judgment is appropriate. See Fed. R. Civ. P. 12(c).

Summary judgment is proper when the evidence viewed in a light most favorable to the nonmoving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, only disputes of facts that might affect the outcome of the suit under the governing substantive law will preclude summary judgment. Id. The moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to all inferences that may be reasonably drawn from the underlying facts in the record. Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 992-93 (8th Cir. 2003). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings—it must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

**B.      42 U.S.C. § 1983**

Tweeton claims that Defendants violated his constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. To prevail on his claims, Tweeton must demonstrate that a person acting under color of state law violated a right protected by the Constitution. See City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985).

Defendants contend that they are entitled to qualified and absolute immunity. The Court conducts a three-part inquiry to determine whether qualified immunity applies: (1) whether Tweeton has asserted a violation of his constitutional rights, (2) whether the allegedly violated constitutional right was clearly established, and (3) whether there are no genuine issues of material fact regarding whether a reasonable official would have known that the alleged acts violated that right. See Foulks v. Cole County, 991 F.2d 454, 456 (8th Cir. 1993). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). Absolute immunity shields officials "from civil rights suits for the performance of duties which are 'integral parts of the judicial process' as long as the judicial function was granted immunity under common law at the time § 1983 was enacted." Dornheim v. Sholes, 430 F.3d 919, 925 (8th Cir. 2005) (citing Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983)).

**C.     Claims**

    1.     <u>First Claim: Duration of the Stop</u>

In the first claim of the Complaint, Tweeton alleges that Sergeant Gorski violated his Fourth Amendment right against unreasonable search and seizure. Specifically, Tweeton claims that the traffic stop was "intolerable in its scope, intensity, and primary duration" because of Sergeant Gorski's questions, comments, search, and delay while conducting a records check and preparing the citation. The Complaint states that Tweeton was detained for "610 seconds," and that "about nine minutes" involved Sergeant Gorski talking to Tweeton and responding to Tweeton's comments.

Defendants are entitled to qualified immunity on this claim because Tweeton has failed to establish a constitutional violation. Approximately ten minutes was not an unreasonable amount of time for Sergeant Gorski to detain Tweeton under these circumstances. During this time, Sergeant Gorski questioned Tweeton, responded to Tweeton's comments, conducted a search, processed a records check, and completed other tasks necessary to mail a complaint to Tweeton. Notably, Tweeton's comments significantly contributed to the time required for Sergeant Gorski to detain him. Moreover, Tweeton fails to show how he was damaged by the detention. Any <u>de minimus</u> injury "is insufficient to support a finding of a constitutional violation." <u>Crumley v. City of St. Paul</u>, 324 F.3d 1003, 1007 (8th Cir. 2003) (citing <u>Hunter v. Namanny</u>, 219 F.3d 825, 831 (8th Cir. 2000); <u>Curd v. City Court</u>, 141 F.3d 839, 841 (8th Cir. 1998)). Accordingly, the Court dismisses Tweeton's claim based on the duration of the stop.

    2.      Second Claim: Terry Search

Tweeton's second claim alleges that Sergeant Gorski violated Tweeton's Fourth Amendment right against unreasonable search and seizure when Sergeant Gorski asked if Tweeton had a knife and reached into Tweeton's pocket to withdraw a health insurance card. An officer may make a limited, warrantless search to discover concealed weapons if the officer has a reasonable suspicion that the person may be armed and presently dangerous to the officer or others. United States v. Roggeman, 279 F.3d 573, 577 (8th Cir. 2002) (citing Terry v. Ohio, 392 U.S. 1, 30 (1967)). Reasonable suspicion requires less justification than probable cause. Id. at 578 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). However, it must be objectively reasonable to believe that the safety of the officer or others was in peril. Id. (citing Terry, 392 U.S. at 27). To determine "whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27.

A traffic stop may possess an inherent danger that justifies a Terry frisk. United States v. Rowland, 341 F.3d 774, 784 (8th Cir. 2003) (holding that the inherent danger of the traffic stop coupled with the fact that neither person in the vehicle could prove ownership of the vehicle justified a Terry search because possible car thieves might possess weapons). However, not all encounters between citizens and police, and not all traffic stops, justify a Terry frisk. See State v. Fort, 660 N.W.2d 415, 419 (Minn. 2003) (holding that an officer's investigative questioning and subsequent search "went beyond the scope of the traffic stop

and was unsupported by any reasonable articulable suspicion"). Thus, the Court must consider evidence of all the circumstances in the light most favorable to Tweeton. See Sokolow, 490 U.S. at 8.

The record establishes sufficient justification for Sergeant Gorski to have reasonably suspected that Tweeton was armed and dangerous. Sergeant Gorski observed Tweeton flashing a light at Sergeant Gorski, positioning a video camera to film Sergeant Gorski, and displaying a police business card with a badge logo on it. Under these circumstances, it was not unreasonable for Sergeant Gorski to believe that Tweeton was attempting to impersonate a police officer. This belief provided a reasonable suspicion that Tweeton may have been armed and presently dangerous. As such, the pat-down was proper and did not violate Tweeton's constitutional right to be free from unreasonable search and seizure. Defendants are therefore entitled to qualified immunity on this claim.

### 3. Third Claim: Vehicle Search

Tweeton's third claim alleges that Sergeant Gorski violated his Fourth Amendment right against unreasonable search by searching inside Tweeton's vehicle. An officer's warrantless search of a vehicle does not violate the Fourth Amendment if the searching officer has "probable cause to believe that the vehicle contains contraband or other evidence of a crime." United States v. Kennedy, 427 F.3d 1136, 1140-41 (8th Cir. 2005) (citations omitted). Probable cause exists if, under all the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Id. at 1141 (citations omitted).

Here, Sergeant Gorski observed Tweeton's use of a flash device and reasonably believed that the flash device was in Tweeton's vehicle. The flash device was seized as evidence of a crime. Thus, Sergeant Gorski had probable cause to search Tweeton's car for the flash device.[2] The Court therefore dismisses the third claim because Defendants are entitled to qualified immunity.

> 4. Fourth Claim: Seizure of Person, Freedom of Speech, Double Jeopardy and Probable Cause

Tweeton's fourth claim alleges that Sergeant Gorski seized Tweeton in violation of the Fourth Amendment. Tweeton asserts that the seizure occurred when he was required to be in court to defend unconstitutional criminal charges—namely, impersonating a police officer and operating a prohibited flashing light. Additionally, Tweeton asserts that requiring him to defend unconstitutional charges was a due process violation under the Fourteenth Amendment; that the charges chilled his right to freedom of speech; and that the charges were not based on probable cause.

As an initial matter, "the view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." Nieves v. McSweeney, 241 F.3d 46, 55 (1st Cir. 2001); see also Jefferson v. City of Omaha Police Dep't, 335 F.3d 804, 806 (8th Cir. 2003) (acknowledging that the Eighth Circuit has not addressed the issue of whether an individual is seized when ordered to appear in court, but noting that "several of

---

[2] Tweeton offers no evidence that Sergeant Gorski's search had any consequence beyond seizure of the flash device, or that the search exceeded the proper scope.

13

our sister circuits have been disinclined to expand fourth-amendment law in" this way). Because court attendance is not a seizure, Tweeton has failed to demonstrate any deprivation of his Fourth Amendment rights.

Moreover, Tweeton fails to show that the criminal charges were unconstitutional. Although he claims that the charges chilled his First Amendment right to freedom of speech, the evidence shows otherwise. Tweeton liberally expressed his views. In fact, Tweeton went so far as to mail letters to Sergeant Gorski's neighbors criticizing Sergeant Gorski. Thus, the Court finds that Tweeton has failed to establish that Sergeant Gorski violated his First Amendment right to free speech.

Tweeton also claims that the charges violated the Double Jeopardy Clause of the Fifth Amendment because the two criminal charges were based on the same evidence: the flash device. The Double Jeopardy Clause protects against multiple punishments for the same offense. United States v. Roy, 408 F.3d 484, 491 (8th Cir. 2005) (citation omitted). However, double jeopardy is not implicated where each offense requires proof of a different element. United States v. Carpenter, 422 F.3d 738, 747 (8th Cir. 2005) (citation omitted). The offense of impersonating a police officer and the offense of operating a prohibited flashing light require proof of different elements. Thus, Tweeton has failed to establish a violation of his Fifth Amendment right to protection against double jeopardy.

Finally, Tweeton argues that the charges were not based on probable cause and that Sergeant Gorski offered false testimony in support of the charges. The argument is baseless and irrelevant to whether Tweeton was unlawfully seized by attending court. Because

Tweeton has failed to establish a constitutional violation, qualified immunity applies and the fourth claim fails as a matter of law.

     5.     <u>Fifth Claim: Freedom of Speech</u>

Tweeton's fifth claim alleges that Sergeant Gorski, Captain Frandrup, Major O'Grady, Officer Jane Doe, and Assistant Attorney General Bilcik violated the First Amendment. In particular, he submits that the December 30, 2004 letter and January 13, 2005 visit to his parents' home "frightened, threatened, and intimidated" him and chilled his speech by causing him to fear criminal punishment.

An officer may informally advise an individual on how to comply with the law and avoid prosecution without limiting the individual's First Amendment freedom. <u>See</u> <u>Bantam Books, Inc. v. Sullivan</u>, 372 U.S. 58, 72 (1963). Minnesota law provides:

> A person who harasses another by committing any of the following acts is guilty of a gross misdemeanor: . . . stalks, . . . repeatedly mails, . . . or knowingly makes false allegations against a peace officer concerning the officer's performance of official duties with intent to influence or tamper with the officer's performance of official duties.

Minn. Stat. § 609.749. Minnesota law further permits an individual being harassed to seek a restraining order after "a single incident of . . . unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of" the individual. <u>Id.</u> § 609.748.

Both the letter and visit were designed to assist Tweeton in complying with the law and avoiding prosecution. No reasonable juror could conclude otherwise. Accordingly, Defendants' acts were proper and did not violate Tweeton's right to free speech. Thus,

Defendants are entitled to qualified immunity on the fifth claim.

      6.      <u>Sixth Claim: Redress of Grievances</u>

Tweeton's sixth claim alleges that Assistant Attorney General Getz violated Tweeton's First Amendment right to petition the government for redress. Specifically, Tweeton claims that certain filings and service of process in the state court action were part of a "scam" to prevent Tweeton's claim.

The allegedly wrongful acts are based entirely on the official conduct of Assistant Attorney General Getz as an attorney defending governmental employees in the state court action. A government attorney who defends a civil suit is entitled to absolute immunity. <u>See Barrett v. United States</u>, 798 F.2d 565, 572-73 (2d Cir. 1986); <u>see also</u> <u>Fry v. Melaragno</u>, 939 F.2d 832, 837 (9th Cir. 1991) ("If the government attorney is performing acts 'intimately associated with the judicial phase' of the litigation, that attorney is entitled to absolute immunity from damage liability).

Furthermore, the record shows that Assistant Attorney General Getz in no way violated the First Amendment. Instead, Tweeton's inexperience with the legal system as a pro se plaintiff contributed to his frustration with issues related to filings and service of process. Tweeton's rights were not violated; rather, Tweeton had insufficient knowledge of how to respond to events in the legal process. Because the challenged conduct was directly associated with the judicial process, absolute immunity applies and the Court dismisses the sixth claim.

**CONCLUSION**

Defendants are entitled to either absolute or qualified immunity as a matter of law. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motions for Summary Judgment (Docket Nos. 12, 14, 18, 19, and 25) are **GRANTED**; and

2. All claims are **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: December 12, 2006                              s/ Paul A. Magnuson
                                                      Paul A. Magnuson
                                                      United States District Court Judge